Gil Ilano COLMENAR, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 98–70422.

United States Court of Appeals,
Ninth Circuit.

Submitted Feb. 11, 2000[1]

Filed April 14, 2000

---

1. The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Daniel P. Hanlon, Reeves and Hanlon, Pasadena, California, for the petitioner.

Laura A. Smith, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: MAGILL,[2] HAWKINS and THOMAS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

Gil Ilano Colmenar petitions for review of the Board of Immigration Appeals' ("BIA") denial of his application for asylum and withholding of deportation. Colmenar argues that the BIA's decision is not supported by substantial evidence and that he was denied a full and fair hearing before the Immigration Judge ("IJ"). We agree that the IJ denied Colmenar a full and fair hearing and that this prejudiced Colmenar's ability to present evidence in

support of his asylum claim. Accordingly, we grant his petition for review and remand to the BIA with instructions to order a new hearing before the IJ.[3]

## I. BACKGROUND

Colmenar, a native and citizen of the Philippines, entered the United States in May 1992 and applied for asylum and withholding of deportation several months later. In his application for asylum, Colmenar presented a detailed account of his alleged persecution. He stated that he was working as a dentist for the Armed Forces of the Philippines when a 17–year-old boy came to him for treatment at a dental clinic. Colmenar administered a local anesthetic to the boy, who reacted to the drug and went into shock. Colmenar and the senior dentist revived the boy and sent him home with instructions to return in a week. When the boy did not return, Colmenar assumed that he no longer needed treatment.

Several weeks later, Colmenar received a letter from "very unhappy people." The letter contained a black ribbon, a symbol to Colmenar that it was sent by the New People's Army ("NPA"), and stated that the boy had died several weeks after being treated by Colmenar. The letter also stated that the boy had been the son of a high-ranking NPA leader and that Colmenar would pay "very dearly" for the boy's death. Colmenar reported the letter to the police, who said they would investigate the matter.

Sometime after receiving this letter, Colmenar was walking home from a friend's house when a man on a motorcycle passed by. The man stopped about 20 feet ahead of him and threw a Molotov cocktail that exploded at Colmenar's feet. Colmenar was taken to a hospital, where he underwent surgery to remove the shards

---

2. The Honorable Frank J. Magill, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

3. Because we remand to the BIA on these grounds, we need not reach Colmenar's motion to remand to the BIA for the presentation of evidence that he is eligible to adjust his status.

from his feet. He stayed in bed for two weeks and was on crutches for two months. Then, fearing for his safety, he moved to Manila to live with an aunt.

One month later, he was walking back from church when he saw two men standing by the gate of his aunt's house, talking and pointing at the gate. This frightened Colmenar so he hid behind a bush and waited for them to leave. Two days later, he saw the same men parked in a jeep in front of the house. The men saw Colmenar, and one of them chased after him. Colmenar's aunt was backing out of the driveway in her car, and when he screamed for help, she rescued him and drove him back to his hometown. His parents then decided that Colmenar should leave the country, so he filed an indefinite leave of absence from his job and departed for the United States.

In his written application, Colmenar also explained why he thought these things had happened to him:

Because I was an intern with the Armed Forces of the Philippines, the NPA believes, and rightfully so, that I am opposed to their movement. While I have never spoken out against the NPA, in my own way, I support the government and resist the communist forces.

When the son of the NPA leader died ... the NPA feared that because I was with the government that I was planted as an informant and intentionally killed the teenager to help destroy the CPP and the NPA. When I reported the incident to the police, this confirmed their fears that I opposed the NPA. I refused to side with them or be loyal to them, even after threats to my life, by keeping the incident quiet or by placating them with financial donations. I do not want to support the NPA in any way, and my opposition, evidenced by the so-called "murder" of the NPA leader's son, is overt in the eyes of the NPA.

Colmenar's deportation hearing was held on January 24, 1997, before Immigration Judge Jay Segal. At the start of the hearing, his attorney asked for a continuance because Colmenar's wife had applied for an adjustment of status. The IJ denied this request, stating that he wanted to resolve the case that day. He also stated, "[T]o be very honest, I have reviewed this case ... and basically it's because the—as I see it, it's a matter of a possible medical malpractice suit rather than anything else. So I have no idea what the basis for the claim is." The IJ then swore in Colmenar as a witness and asked whether everything in his written application was true. When Colmenar replied yes, the IJ turned the questioning over to Colmenar's attorney.

The attorney started with a few preliminary questions and then asked Colmenar why he feared returning to the Philippines. Colmenar briefly described his encounter with the man on the motorcycle. He said he was walking home from a friend's house when the man passed by, stopped about 20 feet away, "took a good look" at Colmenar's face and then threw a Molotov cocktail that exploded at Colmenar's feet. At this point in his testimony, the following exchange occurred between Colmenar, his attorney, and the IJ:

Attorney: And to your knowledge, who was this man?

Colmenar: To my knowledge, it was members of the New People's Army.

IJ: To your knowledge, do you know?

Colmenar: I—

IJ: Do you have any—do you know or have any idea? Did the man say anything to you? Yes or no?

Colmenar: Yes, Your Honor.

IJ: What did he say to you?

Colmenar: He said that I would pay for what happened to his son.

IJ: When did he say that, as the blast was going off, or before?

Colmenar: No, Your Honor. It was prior to that incident.

IJ: On that incident, the question was do you know who the man on the motorcycle was?

Colmenar: No, Your Honor.

IJ: All right, thank you.
Go ahead.

Attorney: Who do you think the man on the motorcycle was?

IJ: That's not a proper question.

Attorney: Well, Your Honor—

IJ: That's not a proper question. The respondent cannot—conjecture is not a proper question. There's no foundation for that question to be asked.

Attorney: Well, we'll establish a foundation then, sir.
What were you doing in the Philippines in 1991?

Colmenar: At that time I was—I belonged to a group conducting medical and dental missions to people—well, to indigent people who could not afford such treatment.

Attorney: And what was your position with this group?

Colmenar: I was a voluntary intern conducting various dental treatments.

Attorney: Are you a dentist?

Colmenar: Yes, I am.

Attorney: And prior to this incident, who were you treating?

IJ: Well, you know, all this is in the record. The respondent admitted all this. This is all in the record. There's no sense to go over that again, counsel. It's here.

Attorney: Your Honor, I—

IJ: It's here. It's not laying a foundation for the respondent to identify someone who he doesn't know, and I won't permit that question, period. Go on to something else.

Attorney: I believe the—

IJ: The respondent has no knowledge of who threw, allegedly threw this Molotov cocktail. I will not permit the question any further. Conjecture is not a proper—the respondent has no basis to make a conjecture.

Attorney: There is circumstantial—

IJ: I find there isn't. Go on.

Attorney: Well, your Honor, if that is your finding, I don't see any purpose in continuing the trial.

IJ: Whatever—

Attorney: This is in the application. His testimony, which would be corroborative of that, is—

IJ: His testimony is corroborative of what he has written. That is not corroborative evidence, counsel. Oral testimony of what somebody had written down in a declaration is not corroborative of the written declaration. Do you understand, counsel?

Attorney: I believe it is.

IJ: Well, I think—I find you're wrong.

Attorney: Well, since everything he is prepared to testify to regarding his injuries and who he believes caused the injuries and why is in the application, at this point I will simply qualify my client for voluntary departure.

IJ: Fine, go ahead.

After his attorney qualified Colmenar for voluntary departure, the government attorney asked to question Colmenar. The government attorney asked Colmenar whether he wanted to say anything else that would substantiate his fear of returning to the Philippines. Colmenar asked to speak to his own attorney about the question, but the IJ denied this request. Colmenar hesitated, and the IJ repeated the government's question. Colmenar responded by saying, "Well, first and foremost, Your Honor, with the alleged medical malpractice, . . ." He then attempted to defend his treatment of the 17–year–old patient. The IJ explained that the court was not adjudicating his competence as a doctor and then stated, "But I know you wish to exculpate yourself and make a statement on that, and go ahead." When Colmenar finished defend-

ing his treatment, the IJ said, "All right, thank you," and the testimony ended.

The IJ denied Colmenar's request for asylum and withholding of deportation. He found that the attacks against Colmenar were motivated by the death of the 17–year–old boy, not by Colmenar's political opinion. On appeal to the BIA, Colmenar argued that he met the statutory requirements for asylum and that the IJ denied him a full and fair hearing. The BIA rejected both arguments. It found that the IJ provided Colmenar ample opportunity to present evidence in support of his claim. It also agreed with the IJ that the attacks against Colmenar were personal acts of revenge and were not motivated by his political opinion. Colmenar then appealed to this court, raising the same claims he raised to the BIA.

## II. DISCUSSION

We agree with the BIA that, based on the evidence in the record, Colmenar has not established that he was persecuted on account of his political opinion. The record contains little evidence that Colmenar expressed a political opinion, that the NPA knew of his political opinion, or that the NPA targeted him on account of that opinion. *See Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997). However, we conclude that the IJ prevented Colmenar from presenting more detailed evidence in support of his claim and that the case must therefore be remanded for a new hearing.

■■■ The Fifth Amendment guarantees due process in deportation proceedings. *See Campos–Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir.1999). As a result, an alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf. *See id;* 8 U.S.C. § 1229a(b)(4). We review claims of due process violations in deportation proceedings de novo, *see Hartooni v. INS*, 21 F.3d 336, 339 (9th Cir.1994), and will reverse the BIA's decision on due process grounds if the proceeding was "so fundamentally unfair that the alien was prevented from

reasonably presenting his case," *Platero–Cortez v. INS*, 804 F.2d 1127, 1132 (9th Cir.1986). We also require an alien to show prejudice, which means that the outcome of the proceeding may have been affected by the alleged violation. *See Campos–Sanchez*, 164 F.3d at 450; *Hartooni*, 21 F.3d at 340.

■■ The transcript in this case makes clear that Colmenar was not given a full and fair hearing or a reasonable opportunity to present evidence on his behalf. At the start of the hearing, the IJ indicated that he had already judged Colmenar's claim, referring to the case as a "possible medical malpractice suit rather than anything else," and stating that he had "no idea what the basis for the claim is." Then, when testimony began, the IJ behaved not as a neutral fact-finder interested in hearing the petitioner's evidence, but as a partisan adjudicator seeking to intimidate Colmenar and his counsel. The IJ refused to let Colmenar testify about who he believed had thrown the Molotov cocktail at him, despite the circumstantial evidence linking the incident to the threatening letter. He also refused to let Colmenar testify about anything that was included in his written application. This prevented Colmenar from elaborating on the fears he had expressed in his application. It also frustrated his attorney to the point that he was forced to end his examination of Colmenar after only a handful of questions.

The IJ's conduct was directly contrary to the BIA's decision in *Matter of Fefe*, 20 I & N Dec. 116, 1989 WL 331875 (BIA 1989). There, the BIA stressed that the "full examination of an applicant [is] an essential aspect of the asylum adjudication process for reasons related to fairness to the parties and to the integrity of the process itself." *Id.* at 118. The BIA also stated that in most instances, an IJ should not rely on an alien's written application alone, but should solicit oral testimony from the applicant. *See id.* This serves two purposes, according to the BIA. First,

it enables an IJ to determine when an alien has fabricated a claim in his written application. *See id.* Second, it allows an alien to "establish[ ] eligibility for asylum by means of his oral testimony when such eligibility would not have been established by the documents alone." *Id.*

Here, the IJ did his best to prevent a full examination of Colmenar, relying instead almost exclusively on Colmenar's written application to make his decision. It is true that the government attorney asked Colmenar at the end of his testimony whether he had anything to add in support of his claim, and that the IJ repeated this question to Colmenar. But Colmenar was clearly nonplused by this point and could not be expected to know what evidence was essential to making his claim; that is, in all likelihood, why he asked to consult with his attorney. Moreover, after Colmenar responded "first and foremost" and defended his treatment of the 17–year–old, the IJ did not ask whether he had any other points. Had the IJ done so, it is possible that Colmenar would have provided additional evidence in support of his claim.

Colmenar was clearly prejudiced by the IJ's conduct. His written application stated that he supported the government in his own way and resisted communist forces; that the NPA believed he was planted as an informant to kill the NPA leader's son and to destroy the NPA; and that the NPA viewed his cooperation with the police and his refusal to make financial contributions as indicative of his opposition.[4] While these conclusory assertions by themselves are insufficient to support a claim for asylum, *see Maroufi v. INS*, 772 F.2d 597, 599 (9th Cir.1985), it is possible that, given a reasonable opportunity to testify, Colmenar could explain how he reached these conclusions. Indeed, Colmenar states in his brief that had he been allowed to testify, "he intended to establish that his attacker, the New People's Army ('NPA'), was motivated by Petitioner's political opinion" and "that the NPA had imputed a political opinion to him." Although Colmenar does not explain exactly what evidence he would have presented to support these assertions, we do not require such an explanation to find prejudice. *See Martin Perez–Lastor v. INS*, 208 F.3d 773, 782 (9th Cir.2000) (drawing inference of prejudice despite lack of evidence as to what petitioner would have testified); *Campos–Sanchez*, 164 F.3d at 450 (finding prejudice without requiring petitioner to explain what arguments he would have raised below).[5] We require the petitioner to show only that the IJ's conduct "potentially [affected] the outcome of the proceedings." *Campos–Sanchez*, 164 F.3d at 450 (quoting *United States v. Cerda–Pena*, 799 F.2d 1374, 1379 (9th Cir.1986)). Colmenar has met this burden. Therefore, he was prejudiced by the lack of a full and fair hearing.

4. That the NPA also may have targeted Colmenar because of the death of the 17–year–old boy is irrelevant. *See Borja v. INS*, 175 F.3d 732, 736 (9th Cir.1999) (asylum may be granted if the persecution "was motivated, at least in part, by an actual or implied protected ground"); *see also Briones v. INS*, 175 F.3d 727, 729 (9th Cir.1999) (holding that "despite the personal origins of a dispute, death threats by people on one side of a civil war against a person suspected of being on the other side constitute[s] persecution on account of political opinion") (quoting *Gomez–Saballos v. INS*, 79 F.3d 912, 917 (9th Cir. 1996)).

5. Moreover, it seems likely that Colmenar thought he was bound by the evidence in the record, as is usually the case on appeal. In his brief, he states that the IJ's conduct prejudiced him because it prevented him "from developing an adequate record on appeal." Although we believe that a petitioner is entitled to present evidence outside the record in order to show that he was prejudiced by the lack of a full and fair hearing, we can find no cases in which we have stated this proposition explicitly. Therefore, we are especially reluctant to penalize Colmenar for failing to explain exactly what evidence he would have presented below if given the chance. *See Martin Perez–Lastor*, 208 F.3d at 782 (9th Cir.2000) ("We cannot require [petitioner] to produce a record that does not exist.").

We do not enjoy second-guessing the way Immigration Judges run their courtrooms. But when a petitioner has so clearly been denied a full and fair hearing, we have no choice. Judges do little to impress the world that this country is the last best hope for freedom by displaying the hard hand and closed mind of the forces asylum seekers are fleeing. Better that we hear these claims out fully and fairly and then make an informed judgment on the merits. This is consistent with our role as judges, and the values of our Constitution demand no less.

PETITION GRANTED; CASE REMANDED WITH INSTRUCTIONS.