**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AGHAVNI CINAPIAN; NOREK
CINAPIAN; AKOP CINAPIAN; GEVORK
CINAPIAN,
                            *Petitioners,*

           v.

ERIC H. HOLDER Jr., Attorney
General,
                            *Respondent.*

No. 05-72445

Agency No.
A75-678-173
A75-678-174
A78-015-327
A95-633-719

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted March 6, 2009
James E. Rogers College of Law
The University of Arizona
Tucson, Arizona

Filed June 3, 2009

Before: Michael Daly Hawkins, Marsha S. Berzon and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Hawkins

**COUNSEL**

Dr. Willie Jordan Curtis, Assistant Dean for Student Affairs and Associate Clinical Professor of Law, and Brooke Mickel-

son, Maria Mendoza and Victoria Diaz, Law Students, The University of Arizona, James E. Rogers College of Law, Tucson, Arizona, for the petitioners.

Brooke M. Maurer and Stephen J. Flynn, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

## OPINION

HAWKINS, Circuit Judge:

Concluding Petitioners' right to a fair hearing was violated and their asylum applications prejudiced by the government's failure to make the author of an adverse forensic evaluation of Petitioners' documents available for cross-examination or to disclose the existence of the report to Petitioners until the day of their hearing and by the Immigration Judge's ("IJ") insistence on proceeding in the face of those failures, we grant the petition for review.

### Factual and Procedural Background

Petitioners are Aghavni Cinapian ("Aghavni"), her husband Norek Cinapian ("Norek"), and their two sons, Akop and Gevork Cinapian (collectively "Petitioners"). They seek review of the decision of the Board of Immigration Appeals ("BIA") affirming the denial of asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

Petitioners testified they are natives and citizens of Iran, ethnic Armenians, and Christians who suffered religious persecution in Iran because they discussed the tenets of the Christian faith with a thirteen-year old Muslim boy, Ali. Ali saw a picture of Jesus Christ in a Bible in Petitioners' home

and asked them questions about Christianity, which they answered. Ali apparently discussed the conversation thereafter because, on August 20, 1999, the Iranian police forcibly broke down Petitioners' door and beat and arrested Aghavni and Norek in front of their children, accusing them of "trying to convert this M[u]sl[i]m boy." The police threatened Petitioners, saying "you know what is waiting for you," and grabbed and tore Aghavni's bible.

According to Petitioners' testimony, after being detained and interrogated by the Iranian police for two days, Aghavni and Norek were charged with attempting to convert a Muslim to Christianity. They were released after their cousins posted bond. They then hired a lawyer, who advised them that the charge was "equivalent to killing an Iranian" and punishable by death or a lengthy prison sentence. Fearful for their lives, they arranged for a smuggler to help them cross the border into Turkey. From there, they boarded a plane to Mexico, where they later entered the United States.

Once here, Aghavni submitted an application for asylum, withholding of removal, and protection under the CAT, naming her husband Norek as a derivative applicant. *See* 8 U.S.C. § 1158(b)(3)(A) ("A spouse or child . . . of an alien who is granted asylum under this subsection may . . . be granted the same status as the alien if accompanying, or following to join, such alien."). Aghavni's application was referred to the Immigration Court, and removal proceedings were commenced against them.

Meanwhile, Akop and Gevork, who initially stayed behind with relatives in Iran, traveled to Moscow. Using a false passport, Akop joined his parents in the United States approximately two years after they had first arrived. He was followed by Gevork approximately one year later. In an interview with U.S. immigration officials, Akop stated that he was born in Armenia and was a citizen of Armenia. According to his mother, Akop did so because he was afraid they would other-

wise return him to Iran. Gevork denies that airport officials questioned him about his citizenship. Later, however, after removal proceedings had been initiated against Gevork, his now-deceased lawyer, Harry Zekian ("Zekian"), admitted to "all the allegations" in the Notice to Appear (which had alleged that Gevork was an Armenian citizen) and stated in a Motion to Change Venue that Gevork "escaped his native country of Armenia." Both Akop and Gevork were charged with removability. Their proceedings were consolidated with their parents', and their claim to relief is derivative of Aghavni's asylum application as well. *See* 8 U.S.C. § 1158(b)(3)(A).

Aghavni testified that she told Zekian that they were from Tehran, Iran, and that she did not know why Zekian stated that Gevork was from Armenia. Zekian died in a motorcycle accident shortly thereafter and thus could not testify at the hearing whether the admission was based on his conversations with Petitioners or the result of his own mistake.

In support of her application for asylum, Aghavni submitted a Christianity Certificate prepared by an Armenian church in Iran certifying that she had been born in Tehran, Iran and was a member of the Armenian Apostolic Church. She also submitted a photocopy of her birth certificate and an original birth certificate for Akop. The photocopied birth certificate was not suitable for forensic analysis, but the other documents were forwarded by the Department of Homeland Security ("DHS") to a forensic laboratory for analysis.

The forensic reports evaluating Petitioners' documents, disclosed to Petitioners for the first time at their asylum hearing, brought the documents' authenticity into question. According to the Forensic Document Examiner, the "letterheads, stamp impressions, authorizing signatures, and most of the body" of the Christianity Certificates "were prepared using color copier technology," but the "individualizing entries are original typewriting." Such "constructed documents" are usually made by copying a master (original and possibly genuine) document

and eradicating the main entries and replacing them with other entries. The Forensic Document Examiner concluded that Akop's birth certificate was "counterfeit" because it did "not conform to a comparable genuine specimen and reference material on file in the FDL reference library" and its background design appeared to have been produced using color inkjet technology and a rubber stamp device.

At the hearing, the IJ stated that the government should have provided the DHS forensic reports to Petitioners prior to the hearing, given that they were written several months earlier. However, the IJ made clear that she would not "reset this case" and "cannot and will not give you a continuance." Petitioners' counsel objected to the reports because she "should have had an opportunity to review [them and] to be able to discuss [them] at length with [her] client[s]" and because she had no "opportunity to cross-examine" the author of the reports. Then, faced with the IJ's refusal to continue the hearing to another date, Petitioners' counsel asked that the reports be given "no weight at all."[1] The IJ acknowledged the concern, but admitted the DHS forensic reports while promising to take Petitioners' concerns into consideration in deciding how much weight to give the reports.

When questioned regarding the documents, Aghavni stated she and Norek paid their cousins in Iran to send the documents, did not inspect them carefully, and did not know they were not genuine. The IJ found that Petitioners were not credible, in large part because of "major inconsistencies and problems" related to "where they are from," which she concluded went "to the heart of their claim." The IJ's oral decision extensively discussed Aghavni's responses to questions about the documents' origins and Aghavni's inability to present additional evidence to corroborate that she and her family had lived in Iran. Based on her adverse credibility finding, the IJ

---

[1]Because the IJ preemptively foreclosed the possibility of a continuance, Petitioners' failure specifically to request a continuance is excusable.

held that Aghavni failed to establish the date of her arrival in the United States, and thus that she had not shown that she submitted her asylum application within one year of her arrival as required by 8 U.S.C. § 1158(a)(2)(B). The IJ therefore pretermitted Petitioners' asylum claim as untimely. The IJ then went on to hold that Petitioners also failed to establish their eligibility for withholding of removal and protection under the CAT because they had not credibly "show[n] where they are from." The IJ denied all relief and ordered Petitioners removed "to either Iran or Armenia."

The BIA "adopt[ed] and affirm[ed]" the IJ's denial of asylum, citing *Matter of Burbano*, 20 I & N Dec. 872, 874 (B.I.A. 1994), "on the basis of [Petitioners'] failure to provide clear and convincing evidence that their applications for asylum were timely filed." The BIA also "adopt[ed] and affirm[ed]" the IJ's denial of withholding of removal and CAT protection, specifying that it agreed with the IJ's finding that Petitioners failed to "provide credible testimony and evidence to establish their alienage and thus carry their burden of proof" for either withholding or CAT protection. Petitioners timely appealed.

## Scope and Standard of Review

Constitutional due process challenges to immigration decisions are reviewed de novo. *Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365, 377 (9th Cir. 2003).Where the BIA cites *Matter of Burbano* and does not express any disagreement with the IJ's decision, we review the IJ's decision as if it were the BIA's. *Abebe v. Gonzales*, 432 F.3d 1037, 1040 (9th Cir. 2005) (en banc).

Before reaching the merits, we first decide a question of the scope of our jurisdiction. In its Notice To Appear, the government alleged that Aghavni last arrived in the United States on September 26, 1999. Aghavni's asylum application is dated November 9, 1999 — less than a year after the date of arrival

alleged in the Notice to Appear, which would mean that her asylum application was timely filed. Petitioners admitted the allegations contained in the Notice To Appear before the IJ, so the allegations are considered judicial admissions. Where, as here, the government alleges an alien's arrival date in its Notice to Appear, and the alien admits the government's allegation before the IJ, the allegations are considered judicial admissions "rendering [the arrival date] undisputed." *Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008). As in *Hakopian*, the government never moved to amend its Notice to Appear with respect to, or otherwise contest, Aghavni's stated date of entry. Therefore, Petitioners "could scarce be expected to produce additional documentary evidence of [their] arrival date." *Id.* at 847.

**[1]** Nonetheless, the IJ held that Aghavni failed credibly to establish the date of her last arrival in the United States, and for that reason held her asylum application untimely. The BIA "adopt[ed] and affirm[ed]" that determination. The government now argues, without attempting to distinguish this case from *Hakopian*, that we lack jurisdiction to review the IJ's timeliness determination, because Petitioners failed to exhaust their claim before the BIA, and so our review cannot extend to the asylum portion of Petitioners' petition for review. Even assuming without deciding that Petitioners had not adequately raised the timeliness issues in their argument before the BIA, "[w]hen the BIA has ignored a procedural defect and elected to consider an issue on its substantive merits, we cannot then decline to consider the issue based upon this procedural defect." *Abebe*, 432 F.3d at 1041.

**[2]** Here, the BIA explicitly did "adopt and affirm" the IJ's timeliness determination and cited to *Matter of Burbano* to signify that it had conducted an independent review of the record and had exercised its own discretion in determining that its conclusions were the same as those articulated by the IJ. As in *Abebe*, the BIA considered the timeliness issue on the merits, rather than holding the argument procedurally

barred. *See id.* Therefore, regardless of the clarity with which Petitioners raised the timeliness issue as connected with their overall challenge to the IJ's adverse credibility finding, we have jurisdiction to review not only the IJ's holdings as to withholding of removal and protection under the CAT, but her holding as to asylum as well. *See Arreguin-Moreno v. Mukasey*, 511 F.3d 1229, 1232 (9th Cir. 2008) ("[W]hen the BIA cites *Burbano* in its decision, all issues presented before the IJ are deemed to have been presented to the BIA.")

## Discussion

**[3]** "[A]n alien who faces deportation is entitled to a full and fair hearing of [her] claims and a reasonable opportunity to present evidence on [her] behalf." *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000). Remand is generally necessary when an alien is prevented from reasonably presenting her case or when an IJ's actions prevent the introduction of significant testimony. *See, e.g.*, *Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1056-57 (9th Cir. 2005) ("Whether the IJ's actions prevented the introduction of significant testimony is critical to the ultimate question whether the alien had a reasonable opportunity to present evidence."); *Reyes-Melendez v. INS*, 342 F.3d 1001, 1006 (9th Cir. 2003). To warrant a new hearing, the alien must also show prejudice, which means that "the outcome of the proceeding may have been affected by the alleged violation." *Colmenar*, 210 F.3d at 971.

## Violation of Due Process Rights

**[4]** The right to a fair hearing derives from the Due Process Clause of the Fifth Amendment, which applies in removal proceedings. *See Colmenar*, 210 F.3d at 971. Congress has specifically provided that an alien in a removal proceeding must have "a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government . . . ." 8 U.S.C. § 1229a(b)(4)(B). Although the Fed-

eral Rules of Evidence do not apply in administrative proceedings, evidence is admissible only if it is probative and its use is fundamentally fair. *Martin-Mendoza v. INS*, 499 F.2d 918, 921 (9th Cir. 1974); *see also In re Toro*, 17 I. & N. Dec. 340, 343 (B.I.A. 1980) ("To be admissible . . . evidence must be probative and its use fundamentally fair so as to not deprive respondents of due process of law as mandated by the fifth amendment.").

**[5]** *Cunanan v. Immigration & Naturalization Service*, 856 F.2d 1373 (9th Cir. 1988), presented circumstances similar to this case. There, the government produced a witness's affidavit harmful to the petitioner's claim, but failed to produce the witness herself. *Id.* at 1375. Noting that the petitioner was unaware of the "affidavit until the hearing date, and therefore could not have known that cross-examining [the witness] would be essential to his defense," we held that the government's failure to make a reasonable effort to present the witness denied the petitioner a "reasonable opportunity to cross-examine" her. *Id.*

**[6]** *Cunanan* is only one of several cases acknowledging the importance of the right to confront evidence and cross-examine witnesses in immigration cases. *See, e.g.*, *Saidane v. INS*, 129 F.3d 1063, 1066 (9th Cir. 1997) (holding that petitioner was denied due process in a deportation proceeding when the government "did not make a good faith effort to afford the alien a reasonable opportunity to confront and to cross-examine the witness against him"); *Baliza v. INS*, 709 F.2d 1231, 1234 (9th Cir. 1983) (holding that the admission of petitioner's ex-wife's affidavit in a deportation proceeding was fundamentally unfair, because "[t]he government knew for over a year that [the ex-wife's] testimony would play a key role in its case" but produced no evidence that it had attempted to secure her appearance at a hearing other than "during a twenty-four hour recess" in the proceedings); *see also Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of

fact, due process requires an opportunity to confront and cross-examine adverse witnesses."). In short, "the [DHS] may not use an affidavit from an absent witness unless the [DHS] first establishes that, despite reasonable efforts, it was unable to secure the presence of the witness at the hearing." *Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674, 681-82 (9th Cir. 2005) (quoting *Ocasio v. Ashcroft*, 375 F.3d 105, 107 (1st Cir. 2004)) (internal quotations omitted).[2]

[7] Forensic evaluations of documents admit to differing degrees of certainty in the examiner's conclusions and a variety of possible innocuous explanations for a document's apparent lack of authenticity may exist. *See, e.g.*, *Zahedi v. INS*, 222 F.3d 1157, 1165 (9th Cir. 2000) (noting ambiguities in a forensic laboratory's letter indicating that documents were neither clearly authentic nor clearly counterfeit and suggesting that many countries lack significant security features on their documents). Even if an "assumption that public officials perform their duties properly without motive or interest other than to submit accurate and fair reports," *Johnson v. City of Pleasanton*, 982 F.2d 350, 352-53 (9th Cir. 1992) (internal quotations omitted), is warranted, it would not obviate the importance of Petitioners' right to cross-examine witnesses against them and test the strength and establish the scope of an expert witness's factual determinations. If given the opportunity, Petitioners might have asked the author of the DHS forensic reports how certain she was of her conclusions, whether she had ever seen a Christianity certificate from Iran prepared in a way that did not appear "constructed" by American standards, or whether she believed the birth certificate was so obviously counterfeit that Petitioners, who possessed no forensic expertise, would have known it to be fake if they had inspected it properly.

---

[2]*Espinoza v. INS*, 45 F.3d 308, 310-11 (9th Cir. 1995), which held cross-examination of a government agent who "simply noted" uncontested facts was not required, is not to the contrary. Here, the forensic analysis contained in the report clearly was not ministerial and Petitioners contested the reports' factual conclusions.

**[8]** For these reasons, we hold that the combination of the government's failure to disclose the DHS forensic reports in advance of the hearing or to make the reports' author available for cross-examination and the IJ's subsequent consideration of the reports under these circumstances denied Petitioners a fair hearing.

**Prejudice**

**[9]** The denial of a fair hearing clearly prejudiced the Petitioners. To establish prejudice, an asylum seeker must also show that "the outcome of the proceeding may have been affected by the alleged violation." *Colmenar*, 210 F.3d at 971. "We may infer prejudice even absent any allegations as to what the petitioner or [her] witnesses might have said if the IJ had not cut off or refused to permit their testimony." *Zolotukhin v. Gonzales*, 417 F.3d 1073, 1077 (9th Cir. 2005); *see also Lopez-Umanzor*, 405 F.3d at 1059 (explaining that "absolute certainty" that "the IJ would have reached a different conclusion" absent the violation is not required).

The government argues that the failure to allow for cross-examination and the delay in producing the forensic reports did not prejudice Petitioners because the IJ's adverse credibility determination was not based on Petitioners' submission of fabricated documents. Rather, the government argues that the IJ found Aghavni's claim of Iranian citizenship was "undercut by numerous inconsistencies" in the testimony, and that the IJ would have made the same finding even if the possibly counterfeit documentation had never been submitted.

**[10]** Other circuits have held that if an applicant's testimony has already been called into question, the absence of reliable corroboration consistent with that testimony can justify an adverse credibility determination. *See Biao Yang v. Gonzales*, 496 F.3d 268, 273 (2d Cir. 2007); *Hoxha v. Gonzales*, 446 F.3d 210, 219 (1st Cir. 2006). Those cases are distinguishable. In *Hoxha*, for example, the petitioner's story

was called into question by factual inconsistencies between two declarations the petitioner himself had submitted in advance of the hearing; the First Circuit noted that the petitioner "could have attempted to rehabilitate his credibility by coming forward with other corroborating evidence," but did not do so. 446 F.3d at 219 (internal quotation marks omitted). Here, in contrast, the documents in question would have corroborated Petitioners' testimony had they not been deemed fraudulent at the hearing. Petitioners had no notice of the need for *additional* corroborating evidence prior to the hearing. More to the point, even after Petitioners were made aware of the challenge to their proof of nationality, one of the main avenues for rehabilitating their testimony remained closed to them because the author of the reports that were primarily responsible for calling their testimony into question was unavailable for cross-examination.

The government suggests the IJ only relied on the DHS forensic reports to discredit the corroborative value of Petitioners' documentation and not as a direct basis for drawing an adverse credibility inference with regard to their testimony. We cannot confidently draw this conclusion, as the record provides strong reason to question the government's characterization of the IJ's decision. The IJ never made explicit how much weight she would give the DHS forensic reports and for what purpose, but merely stated that the procedural concerns would "go to the weight" she would give those reports. The IJ appeared to question Petitioners' credibility primarily because of the forensic reports, not inconsistencies in their testimony. For example, after Aghavni testified that she was from Iran and that her family had lost her original documentation, the IJ pointedly reminded her of the threat of criminal perjury charges and then proceeded to state that what Aghavni had "presented so far is proven, or we have evidence to show that it was false, ma'am. Can you explain that?" In addition, the IJ's oral decision lists "false documents to show that [Petitioners] are not, in fact, from Iran" among the "numerous pieces of evidence . . . to show that [Petitioners] are citizens

and nationals not of Iran." On this evidence, we cannot find, as the government suggests, that the IJ did not rely on the DHS forensic reports as a basis for her adverse credibility determination.

[11] The failure to provide adequate notice of the forensic reports and an opportunity to cross-examine their author denied Petitioners an effective opportunity to rehabilitate their testimony. If they had been given notice, Petitioners might very well have been prepared to produce other evidence to demonstrate that they had lived in Iran and were citizens there or evidence that the process by which authentic Christianity certificates are made in Iran routinely results in documents that appear "constructed" by American standards. Even without notice, Petitioners could potentially have raised some of these factual questions through cross-examination of the Forensic Document Examiner.

[12] To be sure, it might have been more prudent for Petitioners to prepare as much evidence as possible to corroborate each element of their claims, but it is not fair to require Petitioners to preemptively expend significant resources to obtain every possible additional piece of documentation proving that they lived in Iran even when they believed they had already submitted documents that sufficiently and conclusively proved that element of the claim. When the government fails to notify Petitioners in advance of the hearing of evidence and also does not take reasonable steps to make the preparer of that evidence available for cross-examination at the hearing, the proper course is for the IJ either to grant a continuance[3]

---

[3]The record appears to reflect a brief recess, granted for the government's benefit, which also allowed Petitioners to confer briefly with their attorney after receiving the DHS forensic reports. This did not remedy the due process violation because the short delay, unlike a continuance, did not provide Petitioners with the opportunity to obtain valid documents, to obtain affidavits from, or at least consult with, those who sent the suspect documents to Petitioners, to obtain their own expert witness, or to cross-examine the author of the DHS forensic reports.

or to refuse to admit the evidence. *See Cano-Merida v. INS*, 311 F.3d 960, 965 (9th Cir. 2002) ("[S]hortcuts frequently turn out to be mistakes."). By doing neither, the IJ admitted damning evidence but denied Petitioners an adequate opportunity to rebut that evidence, to explain the doubts that evidence raised, or to introduce additional, corroborating evidence of their Iranian citizenship.

**Substantial Evidence Regarding Petitioners' Credibility**

We need not reach Petitioners' argument that a reasonable fact finder would be compelled to find their claim of Iranian citizenship to be credible. After a new hearing in which Petitioners will have had a full and fair opportunity to challenge the DHS forensic reports and cross-examine their author, to explain the origin of the allegedly fraudulent documents, and to supplement the record with additional evidence and testimony to corroborate their claims, the IJ will then have an opportunity to make a fully-informed credibility determination based on all the evidence then available. There is no reason to prejudge that determination.

**[13]** For these reasons, we grant review and remand the case to the BIA so that it may grant Petitioners a new hearing.

**PETITION FOR REVIEW GRANTED.**