**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IGOR BONDARENKO,

*Petitioner*,

v.

ERIC H. HOLDER, JR., Attorney General,

*Respondent*.

No. 08-73972

Agency No. A096-360-042

OPINION

On Petition for Review of an Order of the Board of Immigration Appeals

Argued and Submitted February 4, 2013—Pasadena, California

Filed October 25, 2013

Before: Harry Pregerson, William A. Fletcher, and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge W. Fletcher

# SUMMARY*

## Immigration

The panel granted a petition for review of the Board of Immigration Appeals' decision denying on adverse credibility grounds an application for asylum, withholding of removal, and protection under the Convention Against Torture by a citizen of Russia.

The panel held that the immigration judge violated due process by allowing the government to introduce without prior notice a forensic report concerning a medical document petitioner submitted and by refusing petitioner a continuance to investigate the report. The panel further held that the due process violation caused petitioner prejudice because the IJ's other grounds for finding petitioner not credible were not supported by substantial evidence and petitioner established past harm rising to the level of persecution.

The panel remanded to the Board for further proceedings to allow petitioner a reasonable opportunity to investigate the forensic report on the medical report and to present additional evidence, as appropriate, to the IJ.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Vitaly B. Sigal (argued), Liberman & Sigal, Los Angeles, California, for Petitioner.

Jacob Bashyrov (argued), Carl Henry McIntyre, Jr., Gary J. Newkirk, United States Department of Justice, Washington, D.C., for Respondent.

**OPINION**

W. FLETCHER, Circuit Judge:

Igor Bondarenko petitions for review of a decision of the Board of Immigration Appeals ("BIA") denying his applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Bondarenko claims that he was arrested and beaten by the Russian police, and later hit in the head so severely as to require hospitalization, because of his political activism against the war in Chechnya. The Immigration Judge ("IJ") found Bondarenko not credible, largely based on an investigative report introduced by the government without prior notice to Bondarenko. The report concluded that a medical document Bondarenko had submitted in support of his hospitalization claim was fraudulent. Bondarenko requested an opportunity to investigate the manner in which the report had been prepared, and to question the person who had prepared the report. The IJ denied the request, saying that Bondarenko had already had an opportunity to authenticate the medical document and had failed to do so. The BIA affirmed.

We conclude that Bondarenko was denied due process and grant his petition. The two opinions upon which we primarily base our decision are *Cinapian v. Holder*, 567 F.3d 1067 (9th Cir. 2009), and *Vatyan v. Mukasey*, 508 F.3d 1179 (9th Cir. 2007). We note that both opinions came down after the IJ rendered his decision, and that the opinion in *Cinapian* came down after the BIA rendered its decision.

## I.  Background

Igor Bondarenko is a native and citizen of Russia. He entered the United States on June 22, 2002, on a J-1 cultural exchange visa. He filed for asylum in March 2003. The Department of Homeland Security ("DHS") initiated removal proceedings in September 2003.

The following narrative is based on testimony and other evidence provided by Bondarenko. Bondarenko was a student at the state university in Novosibirsk in 2001 and 2002. He testified through a translator, "I was studying the Russian language and literature and [sic] second subject was German language." While at the university, Bondarenko organized what he characterized as an "anti-war, anti-military student group" with several fellow students.

On three occasions, Bondarenko experienced problems with Russian authorities as a result of his antiwar activities. First, in November 2001, he participated in a small demonstration near the military commissioner's office in Novosibirsk. During the demonstration, a special unit of the police, the "Omon," knocked Bondarenko and other demonstrators to the ground, handcuffed them, and put them on a bus. They were taken to a "cage" at a district police station and held for approximately one and a half hours. The

police questioned Bondarenko, warned him that he was involved in "anti-government activity," and instructed him "not . . . to do it again." The police fined him an amount equivalent to five months' average salary. They also informed the dean of Bondarenko's university that his students were violating the law.

Second, on Saturday, February 23, 2002, Bondarenko again distributed flyers, this time at a "huge" protest against the Chechen war. As Bondarenko and several others were packing up their car after the protest, four police officers approached. Bondarenko recounted that the police "knocked us on the ground . . . face[] down in the snow and they handcuffed us and they put us in a bus that was standing nearby . . . ." Bondarenko was taken to the central police station and detained separately from other members of his group. On Monday, the police took him from his cell and asked him to admit that he and his fellow protesters were receiving money from Chechen warlords. Bondarenko refused to admit the charge. The police then took him back to his cell.

On Tuesday evening, the police again took him from his cell, took him to the same room as before, handcuffed him to a chair, and again asked him to admit that he had been receiving money from Chechen warlords. When Bondarenko refused to sign a document admitting the charge, he was knocked to the floor. Two sergeants took turns beating him in the kidneys and legs with rubber-covered metal batons for about thirty minutes. They then left him alone. After a time, a captain of the Federal Security Service came in and asked him to sign the document admitting the charge. When Bondarenko again refused to do so, the two sergeants

returned. This time, they beat him with batons for about an hour.

Bondarenko was released early Wednesday morning. He speculated that his release may have been due to a telephone call from the "very influential" Soldiers' Mothers organization. After his release, Bondarenko had x-rays taken and learned that no bones had been broken. He tried to submit a complaint about the behavior of the police, but the prosecutor's office refused to accept it.

Third, on June 12, 2002, Bondarenko was present at a demonstration of about five hundred people. While a speaker was talking, a police captain "took the floor" and instructed the participants to "disperse" and "break up." About fifteen or twenty minutes later, police arrived in "Omon" buses. The police were "beating left and right." While Bondarenko was trying to protect a "short girl" who was trying to escape, the police hit him on the head. He was "bleeding a lot," "passed out for a second," and "fell down." He was arrested and put into one of the buses. Bondarenko and others on the bus were sprayed with what Bondarenko believed to be tear gas.

Bondarenko and the others were taken to the central police station. He and thirty other people were crowded into a cell meant to hold four or five people. Because of his head injury, he could not stand. Others in the cell asked the police to call a doctor. After three hours, the police finally took Bondarenko to the emergency room at a hospital, Public Clinic No. 23. Bondarenko spent three days at the hospital. When he was discharged from the hospital on June 15, a "medical doctor" at the hospital gave him a document. The document does not name Bondarenko, but it gives the dates of admission and discharge and describes the injury as

"closed skull-brain trauma of temporal area of medium severity." The document has what appears to be an official stamp at the bottom. Bondarenko's testimony before the IJ was consistent with the dates and injury described in the document.[1]

At the hearing, the IJ asked Bondarenko if he and his fellow demonstrators had a permit for the November 2001 protest. Bondarenko said they did not need one because they were not obstructing anything. Bondarenko added that he knew "for sure" that there had been a permit for the February 2002 protest, testifying that "the permission was gotten by Soldiers Mothers organization." No questions were asked, and no evidence was presented, on whether a permit was required or obtained for the June 2002 protest.

After Bondarenko was discharged from the hospital, he went to the university to prepare for his exams. When he arrived, the dean informed him that he had been expelled as a result of his continuing problems with the authorities. Bondarenko had already received his J-1 visa authorizing him

---

[1] The written translation of the document into English gives the date of admission as July 12, 2002, rather than June 12, 2002. In its brief to us, the government points out that the English translation of the document shows an admission to Public Clinic No. 23 on July 12. If the document actually had a date of July 12, that would be a reason to discount it, for Bondarenko traveled from Moscow to the United States on June 22. The English translation is an obvious mistake, apparent even to someone who does not read Russian. The word "June" is written twice in the document — June 12, the date of admission, and June 15, the date of discharge — in virtually identical script. The confusion was cleared up in a preliminary hearing before the IJ, when the Russian translator in the courtroom said that the date on the document was June 12. The government does not point out in its brief that the mistake in translation was corrected during the course of the proceedings before the IJ.

to travel to the United States. Bondarenko took the train from Novosibirsk to Moscow on June 18, 2002. He flew to the United States on June 22.

While Bondarenko was living in the United States, he received a summons to appear at the Russian Ministry of Internal Affairs. After filing for asylum, he received a second summons requiring him to appear at the "military registration and enlistment office." According to Bondarenko, his expulsion from the university "automatically" required him to serve in the army. He believed that the police were searching for him while he was in the United States because he was avoiding this service and because of previous antigovernment activities. He fears that he will be arrested if he returns to Russia and that he will be "disappear[ed]" or "locked up forever."

In support of his asylum application, Bondarenko submitted (1) the medical document he says he received on June 15, 2002, upon his release from Public Clinic No. 23, (2) the two summonses from the Russian government, (3) a certificate showing that he was dismissed from the university on June 16, 2002, and (4) screenshots of websites for the antiwar organizations with which he worked.

The IJ held a lengthy initial hearing on May 5, 2004, during which Bondarenko testified on both direct and cross. At the end of the hearing, the government objected to the documents Bondarenko submitted, on the ground that they had not been authenticated. Bondarenko's attorney stated that he would not try to have the exhibits independently authenticated because of the difficulties in doing so, but argued that Bondarenko should be allowed to authenticate the documents through his own testimony. The government

stated that it wished to send several of the documents for forensic investigation.

Bondarenko appeared briefly before the IJ on March 7, 2005, March 15, 2006, and October 18, 2006. On each of those dates, the hearing was rescheduled, in part because the government had not received a response to its request for forensic investigation of Bondarenko's documents. Finally, on July 9, 2007, the IJ conducted a brief hearing. The government first questioned Bondarenko about the medical document he claimed to have been given upon his discharge from Public Clinic No. 23. The government then produced a report summarizing its investigation into the authenticity of the document. The government had not previously shown the report to Bondarenko or his attorney.

The report, dated October 18, 2006, was prepared by United States Citizenship and Immigration Service ("USCIS") Assistant Stephen Smoot. The report states, in its entirety:

> On April 3, 2006 a memorandum was received from Megan Oshiro, ACC. Los Angeles, CA requesting that USCIS Moscow verify the authenticity of a medical document submitted by Igor Bondarenko in support of immigration benefits. The medical document in question was purportedly issued by the Municipal Clinic No. 23 in Novosibirsk, Russia.
>
> USCIS Moscow contacted the Head Physician of the City Policlinic No. 26 (formerly Municipal Clinic No. 23) in Novosibirsk, in

order to verify the authenticity of the document. The Head Physician of the hospital, in an official written response to the U.S. Embassy stated the following:

- The form of the document in question does not match known examples of the form that is issued by the hospital.

- There isn't currently, nor has there ever been a Doctor S. B. Ivanov employed by the hospital.

- That there is no record of treatment for Igor Bondarenko at the hospital.

- The document in question is fraudulent.

USCIS Moscow is aware of the confidentiality requirements of 8 C.F.R. § 208.6, and did not reveal or imply the existence of an asylum application on the part of any alien in this investigation.

Given the date on the report, we may infer that by the time of the hearing it had been in the possession of government attorneys for more than eight months. The report includes neither the name of the "head physician of the hospital" who had written the "official response" to the embassy, nor a copy of his response. The report indicates that the number of the clinic has been changed from No. 23 to No. 26 but does not provide the address of the clinic. USCIS Assistant Smoot, who prepared the report, did not attend the hearing.

Bondarenko's attorney objected to the introduction of the report on the ground that this was the first time he had seen it. He requested a continuance so that he could investigate the report. He specifically asked to be allowed to send interrogatories to Smoot to ask him how he conducted his investigation. Bondarenko's attorney said, "We have had our own investigator look into these types of reports and come back with completely different results." The IJ denied the request for a continuance. In the IJ's view, Bondarenko had had the burden of authenticating the medical document, and now it was too late:

> [Bondarenko's attorney]: . . . Your Honor, may I request some more time to do our own investigation?
>
> [IJ]: You should have done it already. . . . [Y]ou have had four years to get this document authenticated.
>
> [Attorney]: We were waiting for this report.
>
> [IJ]: No, you had the burden of getting it authenticated since September of 2003 and you didn't.
>
> [Attorney]: How would I know what's in this report[?]
>
> [IJ]: You don't have to know. All you had to do was get the record authenticated and you didn't do it.

In a written decision, the IJ denied Bondarenko's claims for asylum, withholding of removal, and CAT relief. The IJ found Bondarenko was not credible. Based on the forensic report presented by the government, he found that the medical document was fraudulent. He wrote, "Since Respondent vouched for the veracity of the medical record and did not claim that someone else obtained this document, the court finds that Respondent knew the document was fraudulent." The IJ then pointed to other things in the record, such as inconsistencies in Bondarenko's testimony and the lack of specific detail in the written narrative of his asylum application, and made an adverse credibility finding. The IJ held, in the alternative, that even if Bondarenko were credible, he did not qualify for relief.

The BIA rejected Bondarenko's due process claim:

> Nor are we persuaded by the respondent's arguments that the Immigration Judge committed error and violated his due process by concluding that the respondent'[s] document was fraudulent without allowing the respondent to cross-examine the investigating officer or granting a continuance so that he could conduct his own investigation. In this regard, the Immigration Judge did not abuse his discretion in denying the continuance request, and the proceedings were not "so fundamentally unfair that [the respondent] was prevented from reasonably presenting his case." *Gonzalez v. INS*, 82 F.3d 903, 908 (9th Cir. 1996); *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000)[.]

The BIA upheld the IJ's adverse credibility finding as not clearly erroneous. The BIA noted that the medical document was not the only basis for the IJ's adverse credibility finding. It pointed to other credibility problems and stated, "[T]he constellation of problems identified by the Immigration Judge leads us to conclude that his findings regarding the respondent's lack of credibility are not 'clearly erroneous.'" The BIA further concluded that even if Bondarenko were credible, the harm he had suffered was not "of such severity as to rise to the level of persecution," and that the IJ did not err "in concluding that the respondent failed to adequately demonstrate an objectively reasonable well-founded fear of future persecution."

Bondarenko timely petitioned for review.

## II.  Standard of Review

The BIA affirmed the IJ's decision, citing *Matter of Burbano*, 20 I. & N. Dec. 872, 874 (B.I.A. 1994). When the BIA cites *Matter of Burbano* and does not expressly disagree with the IJ's decision, it adopts the IJ's decision in its entirety. *Id.* at 874; *Abebe v. Gonzales*, 432 F.3d 1037, 1040 (9th Cir. 2005) (en banc). When the BIA cites *Burbano* but adds its own analysis, we review factual findings by both the BIA and the IJ for substantial evidence. *Ali v. Holder*, 637 F.3d 1025, 1028-29 (9th Cir. 2011); *Hakeem v. INS*, 273 F.3d 812, 816 (9th Cir. 2001).

We review constitutional due process challenges to immigration decisions de novo. *Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365, 377 (9th Cir. 2003) (en banc). "We review for substantial evidence the BIA's decision that an applicant has failed to establish eligibility for asylum."

*Njuguna v. Ashcroft*, 374 F.3d 765, 769 (9th Cir. 2004). The BIA's d    etermination of facts is "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

## III.  Discussion

Bondarenko challenges the BIA's decision in several respects. His most important arguments are (1) the IJ violated due process by allowing the government to introduce its forensic report on the medical document without prior notice and by refusing a continuance to allow Bondarenko to investigate the report; (2) on the assumption that Bondarenko was credible, the IJ and the BIA improperly concluded that he had not suffered past persecution; and (3) the government improperly revealed information about Bondarenko's asylum application in conducting its forensic investigation of the medical document.

## A.  Due Process

We conclude that the IJ violated due process in not allowing Bondarenko a continuance to investigate the forensic report. "[A]n alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf." *Colmenar*, 210 F.3d at 971. In circumstances remarkably similar to those in Bondarenko's case, we held in *Cinapian v. Holder*, 567 F.3d 1067 (9th Cir. 2009), that the government had violated due process. *Id.* at 1074–75. At the Cinapians' asylum hearing, the government had submitted, without prior notice, forensic reports concluding that documents the Cinapians had submitted were fraudulent. *Id.* at 1071–72. The author of the report was not available for cross-

examination at the hearing. *Id.* at 1072. The IJ refused a continuance to allow the Cinapians to review the reports. *Id*. We held that "the combination of the government's failure to disclose the DHS forensic reports in advance of the hearing or to make the reports' author available for cross-examination and the IJ's subsequent consideration of the reports under these circumstances denied Petitioners a fair hearing." *Id.* at 1075.

Our central concern in *Cinapian* was the right to cross-examination. We emphasized "the importance of Petitioners' right to cross-examine witnesses against them and test the strength and establish the scope of an expert witness's factual determinations." *Id.* But we indicated that the due process right to a timely production of an adverse forensic report goes beyond the inability to cross-examine its author. The due process right, incorporated into 8 U.S.C. § 1229a(b)(4)(B), includes, among other things, "a reasonable opportunity to examine the evidence against the alien." *Cinapian*, 567 F.3d at 1074 (quoting the statutory language). The government did not provide "a reasonable opportunity" in the Cinapians' case to investigate the reports. Similarly, in the case now before us, the government did not provide "a reasonable opportunity" to investigate the forensic report. It had the report in its possession for over eight months before the hearing, yet failed to provide that report to Bondarenko until after he was on the witness stand. But even if the government had received the report only a few days before the hearing, that would not have relieved it of its obligation to allow Bondarenko "a reasonable opportunity" to investigate the report.

It is no answer to say, as the IJ did, that Bondarenko had an obligation to "authenticate" the medical document, above

and beyond his own testimony, such that he forfeited any right to investigate the forensic report. We held in *Vatyan* that an alien may provide authentication through his or her own testimony. 508 F.3d at 1184–85. It is often unreasonable to expect an alien to obtain authentication by officials of the persecuting government from which he or she seeks asylum. *Id.* at 1183. Further, even putting to one side the difficulty of obtaining official authentication from a persecuting government, the expense and difficulty of obtaining official authentication is often substantial. Therefore, as we wrote in *Vatyan*, "[W]e have recognized that 'an asylum applicant does not have an affirmative duty to have a document examiner authenticate every piece of documentary evidence.'" *Id.* (quoting *Lin v. Gonzales*, 434 F.3d 1158, 1165 (9th Cir. 2006)). Until the government introduced the forensic report at the July 2007 hearing, Bondarenko had authenticated the medical document though his testimony that he had personally received it when he was discharged from the hospital on June 15, 2002. When the government introduced the forensic report, Bondarenko's authentication was of course put in serious doubt. But at that point, Bondarenko had a due process right to "a reasonable opportunity" to investigate the report.

"To establish prejudice, an asylum seeker must . . . show that 'the outcome of the proceeding may have been affected by the alleged violation.'" *Cinapian*, 567 F.3d at 1075 (quoting *Colmenar*, 210 F.3d at 971). The government argues that Bondarenko was not prejudiced by any due process violation, contending that the IJ and the BIA found Bondarenko to be not credible independent of the forensic report discrediting the medical document. We disagree with the government's reading of the record and with its conclusion that the due process violation was harmless.

If the medical document is fraudulent, it fatally undermines Bondarenko's application for relief. The IJ made clear that his finding that the medical document was fraudulent was the central justification for his adverse credibility finding. He described what were, in his view, additional credibility "problems," but he did not say that he would have found Bondarenko incredible if the medical document had been genuine. Similarly, the BIA affirmed the IJ's adverse credibility finding based on what it called the "constellation of problems identified by the Immigration Judge." Moreover, we note that some of the additional "problems" identified by the IJ do not support an adverse credibility finding. For example, the IJ questioned the validity of the "certificate" from Bondarenko's university that stated that Bondarenko had been dismissed on June 16, 2002. The IJ wrote that the certificate does not state the reason why Bondarenko was dismissed. He then wrote, "More importantly, the validity of this 'Certificate,' or Respondent's testimony, is seriously placed in question by Respondent's testimony that he majored in 'Russian Language and Literature' . . . . However, the 'Certificate' states that he was a student of the 'Faculty of Foreign Languages with major in "*English and German Languages.*"[']" (Emphasis in original.) The IJ left out some of Bondarenko's testimony. Bondarenko had testified that his "second subject was German language." Particularly given the possible distortions produced by the translation from Russian into English, it is quite conceivable that a student with a "second subject" of German could have been enrolled in the Faculty of Foreign Languages with a major entitled "English and German Languages."

## B.  Past Persecution

The government further argues that Bondarenko was not prejudiced because the IJ and the BIA found, on the assumption that he was credible, that he had not suffered past persecution.  We disagree.

To be eligible for asylum, an alien must show that he or she has a "well-founded fear of persecution," that the persecution is "on account of" a protected ground — "race, religion, nationality, membership in a particular social group, or political opinion" — and that he or she is "unable or unwilling to return to" his or her home country as a result. 8 U.S.C. § 1101(a)(42)(A).  Persecution is "the infliction of suffering or harm . . . in a way regarded as offensive." *Li v. Ashcroft*, 356 F.3d 1153, 1158 (9th Cir. 2004) (en banc) (internal quotation marks omitted).  An applicant can show harm sufficient to constitute persecution in two ways.  He can demonstrate past persecution, after which his "fear of future persecution is presumed," or he can "actually show[] a well-founded fear of future persecution." *Deloso v. Ashcroft*, 393 F.3d 858, 863-64 (9th Cir. 2005).  Injuries that might not individually reach the level of persecution may nevertheless cumulatively support an asylum claim. *See Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998).

We conclude, assuming that Bondarenko is credible, that he has suffered past persecution.  Bondarenko's evidence, if believed, shows that he was detained three times because of his political activism against the Chechen war.  During his second detention, he was severely beaten.  During the protest that led to his third detention, he was hit in the head by the police with such force that he was hospitalized for three days.

After he was released from his third detention, he was dismissed from the university where he had been studying.

The IJ and the BIA concluded that, even if Bondarenko were credible, the harm he suffered at the hands of the Russian police did not rise to the level of past persecution. The IJ wrote that Bondarenko's "so-called beating and short detention in February 2002 was not extreme enough to rise to the level of persecution since he was not seriously injured and no conditions were attached to his release." He wrote further, "Respondent was only detained and 'beaten' on one occasion in February 2002, and the occasion when he was allegedly struck on the head, was a single incident where the police were trying to disperse the demonstrators who apparently did not have a permit." Without summarizing or referring to the evidence of harm suffered by Bondarenko, the BIA wrote that he "failed to establish that any harm he may have suffered, even in the aggregate, was of such severity as to rise to the level of persecution." We disagree with the IJ and the BIA.

In reaching his conclusion, the IJ misstated the evidence. First, the IJ unduly minimized the severity of what he characterized as the "short detention" and "so-called beating" in February 2002. According to Bondarenko, he was detained at the central police station in February for about three and a half days, from Saturday evening until early the following Wednesday. He was subjected to two beatings on his kidneys and legs by two police sergeants with rubber-covered metal batons. The first beating lasted about thirty minutes. The second lasted about an hour. Second, the IJ minimized the severity of the blow on the head Bondarenko suffered in June 2002, saying only that he was "struck in the head." He did not say that the blow was so severe that Bondarenko was hospitalized for three days. Further, the IJ stated there was

"apparently" no permit for the June protest, suggesting that the police were justified in hitting Bondarenko in the head as they broke up the protest. The IJ's suggestion that a permit was required and not obtained for the June protest is entirely without foundation. As recounted above, there is evidence in the record that no permit was required for the first demonstration in November 2001, and that a permit had been obtained for the second demonstration in February 2002. But there is nothing in the record with respect to a permit for the third demonstration in June 2002. Finally, the IJ does not consider the fact that Bondarenko was dismissed from the university as a result of his difficulties with the police.

The IJ relied on our decision in *Gu v. Gonzales*, 454 F.3d 1014 (9th Cir. 2006), to conclude that Bondarenko did not suffer past persecution. The government similarly relies on *Gu*. Gu was arrested by Chinese authorities because he distributed Christian religious materials and attended an unofficial "house church." *Id.* at 1017. He was detained by the police for three days. During those three days, he was interrogated for two hours. The police "hit his back with a rod approximately ten times." *Id.* at 1018. "[H]e was in pain at the time and . . . the strikes left temporary red marks, but required no medical treatment." *Id.* We concluded in *Gu* that the harm suffered did not rise to the level of persecution. *Id.* at 1019–22.

The more closely comparable case is *Guo v. Ashcroft*, 361 F.3d 1194 (9th Cir. 2004), in which, on the assumption that Guo was credible, the IJ and the BIA held that he had not suffered past persecution. According to Guo, he was arrested by Chinese police during a Christian service in a private home. He was then held at the police station for a day and a half. While there, he was struck twice in the face, forced to

do pushups "until he could no longer stand it," and kicked in the stomach while on the floor. *Id.* at 1197. A week later, Guo tried to stop a police officer from removing a cross from a tomb. The officer subdued him with an "electrically-charged baton," and two police officers caused him to fall by kicking his legs from under him. *Id.* at 1198. He was then taken to the police station and held for fifteen days. While at the police station, he was struck in the face seven or eight times. After his release, he was terminated from his employment. We held that the BIA's conclusion that Guo had not suffered past persecution was not supported by substantial evidence. *Id.* at 1202–03.

The details of mistreatment by police always differ from one case to the next, and of course the precise details in Bondarenko's case are different from those in Guo's. But the severity of harm suffered by Bondarenko and Guo is comparable. Both suffered repeated detentions by the police (Guo's somewhat longer); both suffered injuries (Bondarenko's somewhat more severe); and both lost their position (employment in Guo's case, student status in Bondarenko's). By contrast, the harm suffered by Gu was much less severe. Gu was detained by the police on one occasion for three days and was struck on the back with a rod approximately ten times.

## C. Improper Revealing of Personal Information

Bondarenko contends that the government improperly disclosed information contained in his asylum application to medical authorities in Russia when it investigated the medical document. The government may not disclose "[i]nformation contained in or pertaining to any asylum application, records pertaining to any credible fear determination conducted

pursuant to [8 C.F.R.] § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to [8 C.F.R.] § 208.31" without the permission of the alien seeking asylum. 8 C.F.R. § 208.6(a). Bondarenko argues that the investigating officials inappropriately disclosed information about him that may "lead . . . authorities and the very people that are searching for Petitioner to discovering that Petitioner is seeking asylum."

Bondarenko's argument is foreclosed on the current record. The forensic report expressly states that "USCIS Moscow is aware of the confidentiality requirements of 8 C.F.R. § 208.6, and did not reveal or imply the existence of an asylum application on the part of any alien in this investigation." Bondarenko has produced no evidence contradicting this statement.

### D. Withholding of Removal and CAT Relief

The government also claims that Bondarenko was not prejudiced because he is statutorily ineligible for withholding of removal or CAT relief. The BIA did not discuss withholding of removal or CAT relief except to note briefly that Bondarenko had appealed the IJ's decision. Under the circumstances, we do not address those claims for relief at this time. We vacate the BIA's denial of withholding of removal and CAT relief and remand to the BIA in light of what we hold above. *See Su Hwa She v. Holder*, 629 F.3d 958, 963–64 (9th Cir. 2010); *Arredondo v. Holder*, 623 F.3d 1317, 1320 (9th Cir. 2010).

Conclusion

We grant Bondarenko's petition for review and remand to the BIA for further proceedings to allow him a reasonable opportunity to investigate the forensic report on the medical report and to present additional evidence, as appropriate, to the IJ.

**PETITION GRANTED AND REMANDED.**