**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LIANHUA JIANG,<br><br>*Petitioner*,<br><br>v.<br><br>ERIC H. HOLDER, JR., Attorney General,<br><br>*Respondent*. | No. 09-70900<br><br>Agency No.<br>A099-044-559<br><br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted August 30, 2013[*]
Pasadena, California

Filed June 12, 2014

Before: Diarmuid F. O'Scannlain and Carlos T. Bea,
Circuit Judges, and Gloria M. Navarro, Chief District
Judge.[**]

Opinion by Judge Navarro;
Partial Concurrence and Partial Dissent by Judge Bea

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable Gloria M. Navarro, Chief District Judge for the U.S. District Court for the District of Nevada, sitting by designation.

## SUMMARY[***]

### Immigration

The panel denied a petition for review of the Board of Immigration Appeals' denial of asylum, withholding of removal, and protection under the Convention Against Torture.

The panel held the inconsistency between petitioner's asylum declaration, in which she recounted her physical abuse during detention, and her failure to testify about that abuse until she was prompted to do so by her attorney, was sufficient to support the IJ's adverse credibility determination. The panel explained that the evidence did not compel petitioner's interpretation of her testimony.

Because petitioner's CAT claim was based on the same testimony found to be not credible, and she pointed to no other evidence that the IJ should have considered, the panel held that substantial evidence supported the denial of CAT relief.

The panel rejected petitioner's contention that the IJ deprived her of due process by failing to act as a neutral arbiter because she failed to show that the IJ prevented her from presenting evidence or that the IJ's actions prejudiced her.

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting in part and concurring in part, Judge Bea wrote that the IJ failed to provide a legitimate articulable basis or specific cogent reason for the credibility determination. Judge Bea explained that the IJ based that finding not upon substantial evidence, but rather the IJ's own misunderstanding of petitioner's attorney's non-chronological questions and of the plain words of petitioner's answers. Judge Bea concurred with the majority's due process analysis.

---

**COUNSEL**

Joseph S. Porta, Law Offices of Cohen, Porta & Kim, Los Angeles, California, for Petitioner.

Liza S. Murcia, Attorney, Tony West, Assistant Attorney General, and Anthony C. Payne, Senior Litigation Counsel, United States Department of Justice Civil Division, Washington, D.C., for Respondent.

---

**OPINION**

NAVARRO, Chief District Judge:

Lianhua Jiang ("Petitioner"), a native and citizen of China, petitions for review of the Board of Immigration Appeals ("BIA") decision, which substantially adopted the order of the Immigration Judge ("IJ") that denied asylum, withholding of removal and relief under the Convention Against Torture ("CAT"). In denying Petitioner's application, the IJ found Petitioner not credible. Petitioner now petitions for review and argues that the IJ's adverse credibility

determination is based on impermissible grounds and is not supported by substantial evidence.

We have jurisdiction under 8 U.S.C. § 1252. In light of the highly deferential standard of review, we deny the petition.

## I. FACTS AND PROCEEDINGS BELOW

Petitioner is a native and citizen of the People's Republic of China and is of ethnic Korean descent. She also claims to be a Christian. Petitioner entered the United States in June 2005 and, on August 4, 2005, she submitted an application for asylum, withholding of removal, and protection under CAT.

## A

In her asylum declaration, Petitioner claims that she is seeking asylum because of religious persecution by the Chinese government. Specifically, Petitioner alleges that she began attending Christian services at an unofficial "house church" in October 2003 and was baptized on Christmas Day 2003. Petitioner's declaration further states that, on January 16, 2005, while attending a church service at the house church, the police arrested her for attending an illegal meeting. Petitioner asserts that the police detained her for seventeen days.

The asylum declaration also describes the police treatment that Petitioner endured during her detention. First, she claims that the police took her to an interrogation room, slapped her face, accused her of illegal activity, and threatened to send her to a labor camp if she refused to

confess. Additionally, the declaration explains that, when she refused to confess to the police's allegations, the police began yelling and kicking her legs and back until she lost consciousness. When she later regained consciousness, she was in a jail cell and was still feeling the effects of the physical abuse. Later, the police forced her to read the government newspaper and write reports on the articles contained therein. After her detention, Petitioner decided to leave China and seek asylum in the United States.

**B**

After an interview with an asylum officer, Petitioner's application was referred to an IJ for removal proceedings. At her removal hearing, Petitioner testified that the police interrogated her during the detention. However, when asked whether the police did anything else, "[b]esides interrogating [her]," Petitioner responded only that the police "forced [her] to read government newspaper" and then write about the subject of the newspaper articles. She also testified that, to ensure that she read the newspapers, the police threatened to put her parents in jail.

Petitioner was asked four times whether anything else happened during her detention, other than being forced to read the government newspaper. Each of these four times, Petitioner failed to mention the physical abuse that she expressly described in her asylum declaration. After the fourth time, Petitioner's attorney stated "[b]ut on your statement you say that they kicked you." In response to this statement, the IJ confirmed that the attorney was attempting to rehabilitate the Petitioner. Then, after the IJ noted that Petitioner had failed to testify that she was physically abused,

Petitioner attempted to reconcile this inconsistency by distinguishing the interrogation from her time in jail.

After further questioning, Petitioner testified that she was interrogated in an "interrogation room" that was part of the "police station and jail." Petitioner further explained that she understood the previous questioning about her treatment while she was detained in the jail to relate only to what occurred "in the jail, inside of the cell." After she was reminded of her previous statements in her asylum declaration, Petitioner testified that the police slapped her while she was in the interrogation room. She also testified that soon thereafter, a person began kicking her in her lower back, leg, and body until she "fell down to the ground" and eventually lost consciousness. She testified that she regained consciousness in a jail cell. On that same day, the police began forcing her to read the government newspaper.

## C

In addition to testimony about Petitioner's detention in China and Petitioner's religious activities, the IJ also heard testimony about Petitioner's living arrangements after she arrived in the United States. Petitioner testified that, after she entered the United States, she traveled to Los Angeles and contacted her "roommate," whom she later identified as "Mr. Im." She further testified that she was living with Mr. Im, his wife, and his son.

The IJ also heard testimony from Mr. Im, during which he confirmed that Petitioner was living in his home. In response to this confirmation, the IJ commented "[t]hat's convenient,"and then asked "[d]oes anyone else live there?" Mr. Im confirmed that his wife also lives with him, but also

noted that "she comes and goes." The IJ then requested that Mr. Im's wife provide testimony, but Mr. Im's wife refused.

## D

In the IJ's oral ruling, she found that Petitioner was removable as charged and denied Petitioner's application for asylum, withholding of removal, and protection under CAT. The IJ concluded that Petitioner failed to provide sufficient credible evidence to establish her eligibility for the requested relief.

Relying primarily on the inconsistencies between Petitioner's asylum declaration and her testimony before the IJ, the IJ first found Petitioner not credible. The IJ was chiefly concerned with Petitioner's failure to testify about being threatened with being sent to a labor camp and her failure to testify about the physical abuse that she suffered during her detention. The IJ emphasized that Petitioner was prompted multiple times and, nevertheless, each time failed to testify about the physical abuse. Additionally, the IJ was concerned that Petitioner testified about her 2003 baptism in China only after the IJ specifically asked about any significant events that occurred between the date on which Petitioner became a Christian and the beginning of her detention. Finally, the IJ supported her adverse credibility finding by rejecting Petitioner's attempt to reconcile her testimony with the statements in her asylum declaration.

## E

Petitioner filed a timely Notice of Appeal of the IJ's decision with the BIA. The BIA ultimately rejected all of Petitioner's arguments and dismissed her appeal. On appeal

to the BIA, Petitioner first objected to the IJ's adverse credibility determination. The BIA reviewed the IJ's decision for clear error and affirmed the IJ's adverse credibility finding and the denial of Petitioner's application. Consequently, the BIA dismissed Petitioner's appeal in an order summarizing the IJ's oral ruling.

In addition, Petitioner argued that the IJ deprived her of a full and fair hearing by failing to act as a neutral fact-finder. Specifically, Petitioner asserted that the IJ demonstrated impermissible moral judgment through her commentary on the relationship between Petitioner and her roommate, Mr. Im. Petitioner also argued that the IJ conducted "aggressive" questioning that "interrupted the hearing." The BIA rejected these arguments. The BIA further determined that, even to the extent that the IJ made improper or unnecessary comments during the hearing, these comments did not reflect impropriety. Rather, these comments represented the IJ's efforts to ascertain the nature of Petitioner's relationship with each witness, and thereby assess each witness's credibility. For these reasons, the BIA concluded that the hearing was fundamentally fair.

## II. STANDARD OF REVIEW

"Where, as here, the BIA adopts the IJ's decision while adding some of its own reasoning, we review both decisions." *Lopez-Cardona v. Holder*, 662 F.3d 1110, 1111 (9th Cir. 2011). We review the BIA's factual findings, including adverse credibility determinations, for substantial evidence. *Salaam v. INS*, 229 F.3d 1234, 1237–38 (9th Cir. 2000). This standard of review is "extremely deferential: 'administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'"

*Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003) (quoting 8 U.S.C. § 1252(b)(4)(A)–(B)). "Thus, when a petitioner contends that the IJ's findings are erroneous, the petitioner 'must establish that the evidence not only *supports* that conclusion, but *compels* it.'" *Id.* (quoting *Singh v. INS*, 134 F.3d 962, 966 (9th Cir. 1998)).

We review the BIA's determination of purely legal questions de novo. *Hamazaspyan v. Holder*, 590 F.3d 744, 747 (9th Cir. 2009). Claims of due process violations in immigration proceedings are also reviewed de novo. *Lopez-Urenda v. Ashcroft*, 345 F.3d 788, 791 (9th Cir. 2003).

## III. ADVERSE CREDIBILITY DETERMINATION

Because Petitioner filed her asylum application after May 11, 2005, the REAL ID Act governs the determination of her credibility. 8 U.S.C. § 1158(b)(1)(B)(iii); *see also Shrestha v. Holder*, 590 F.3d 1034, 1039 (9th Cir. 2010). Specifically, this standard governing adverse credibility determinations provides:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the

consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

8 U.S.C. § 1158(b)(1)(B)(iii); *see also Shrestha*, 590 F.3d at 1039–40. Furthermore, "[a]lthough we review credibility findings under the deferential substantial evidence standard, in order to make an adverse credibility finding, the BIA must have a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief." *Malhi v. INS*, 336 F.3d 989, 992 (9th Cir. 2003) (internal quotation marks omitted).

## A

The BIA rested its adverse credibility determination on several grounds. Here, we rely only on Petitioner's failure to testify that she was physically abused during her detention until she was prompted to do so by her attorney. *Rizk v. Holder*, 629 F.3d 1083, 1088–89 (9th Cir. 2011) ("Because we must uphold the IJ's adverse credibility determination *so long as even one basis* is supported by substantial evidence, we focus on one of the key contradictions the IJ identified." (internal citation omitted) (emphasis added)). Because this

inconsistency is sufficient to support the IJ's adverse credibility finding, we need not comment on the remaining grounds cited by the BIA.

In an attempt to discredit the IJ's adverse credibility determination, both Petitioner and the dissent primarily rely on the following portion of Petitioner's testimony:

Q. How many of you were arrested?

A. About 20 people.

Q. Okay, where did, did they take you?

A. To police station.

Q. Okay, and how long were you detained at the police station?

A. For about 17 days.

Q. How many times?

A. Once

Q. Okay. Besides interrogating you, did police do, did anything to you during these 17 days?

A. Yes.

Q. What did they do?

A. They forced me to read government newspaper.

Based on this short exchange between Petitioner and her attorney, the dissent argues that Petitioner was confused by her attorney's line of questioning. According to the dissent, Petitioner distinguished between the events that occurred in the "interrogation room" and events that occurred outside the interrogation room, in the "jail." When Petitioner's attorney asked her whether anything happened to her during her detention "besides interrogat[ion]," the dissent claims that Petitioner interpreted that question and the related subsequent questions as solely relating to how she was treated *outside the interrogation room*. The dissent further contends that Petitioner did not mention the physical abuse in response to her attorney's line of questioning because she was only beaten *inside* the interrogation room.

We recognize that the dissent provides one feasible interpretation of Petitioner's testimony. However, the dissent's interpretation is not the only plausible interpretation. As such, even though the dissent's explanation is conceivable, it fails to accord proper respect to the standard of review for adverse credibility determinations. Specifically, to overturn an IJ's adverse credibility determination, we must find that "the evidence not only *supports* [a contrary] conclusion, but *compels* it." *Rizk*, 629 F.3d at 1087 (alteration in original) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)).

In this case, one could reasonably interpret the questions that Petitioner was asked, as the IJ did, as inquiring about Petitioner's treatment *at any time* during her detention and *at any location* within the detention facility. Petitioner was asked four separate times "what else" happened to her "during [those] 17 days" of her captivity. Throughout these "what else" inquiries, the questions were phrased in a general

manner without a specific reference to any particular location. For example, Petitioner was asked: "Okay. Anything else happen?" The IJ apparently interpreted these questions in this manner, as applying generally to Petitioner's time in the detention facility, when she rejected Petitioner's explanation for her inconsistency: "The Court does not believe that this is a credible explanation for her omission, particularly given that she was asked did anything else happen." *See Shrestha*, 590 F.3d at 1044 (noting that an IJ is required to consider a petitioner's explanation for inconsistencies as part of the adverse credibility determination).

In contrast, the dissent interprets this "what else" line of questioning as inquiring into activity occurring solely in the "jail" and outside the "interrogation room." Nothing in the record, however, *compels* this interpretation. Indeed, as Petitioner conceded, the interrogation room was located inside the jail, so distinguishing between the interrogation room and the jail makes little sense.

For these reasons, although one *could* interpret Petitioner's testimony as being consistent with the manner in which her attorney phrased the questions, one could just as easily conclude that Petitioner failed to mention critical facts in a way that was inconsistent with her declaration. It cannot be said, then, that the evidence compels the interpretation of the evidence advocated by the Petitioner and the dissent such that we must reverse the IJ's finding. *See Rizk*, 629 F.3d at 1088 ("If the IJ reasonably rejects the alien's explanation [for an inconsistency] . . . , the IJ may properly rely on the inconsistency as support for an adverse credibility determination." (internal citation omitted)). Taking the position suggested by the dissent would require that we supplant the IJ's credibility determination with our own, as if

we were conducting a de novo review. Given the extremely deferential standard of review, anything approaching a de novo review is improper. Thus, Petitioner's asylum claim must fail.

## B

To demonstrate eligibility for withholding of removal, "the petitioner must show a 'clear probability' of the threat to life or freedom if deported to his or her country of nationality." *Tamang v. Holder*, 598 F.3d 1083, 1091 (9th Cir. 2010). "The clear probability standard is more stringent than the well-founded fear standard for asylum." *Id.* Consequently, because Petitioner's asylum claim fails, her withholding of removal claim also fails. *See Farah*, 348 F.3d at 1156 ("Because we affirm the BIA's determination that Farah failed to establish eligibility for asylum, we also affirm the denial of Farah's application for withholding of removal.").

## C

Article 3 of the Convention Against Torture ("CAT") prohibits states from returning anyone to another state "where there are substantial grounds for believing that [she] would be in danger of being subjected to torture." *Khourassany v. INS*, 208 F.3d 1096, 1099 (9th Cir. 2000). To establish eligibility for relief under CAT, the applicant must "establish that it is more likely than not that . . . she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Although an adverse credibility finding does not necessarily preclude relief, a claim for relief under CAT may still be rejected when the petitioner fails to provide evidence beyond those statements that the IJ determined were not credible. *See*

*Farah*, 348 F.3d at 1157 (affirming the BIA's rejection of a CAT claim when the petitioner failed to point to any "other evidence that he could claim the BIA should have considered in making its determination under [CAT]").

Here, the only evidence in the record to support Petitioner's CAT claim is the same testimony that the IJ found not credible and the Country Report on Human Rights practices for China ("Country Report"). Although the Country Report confirms that religious persecution does occur in China, by itself, the Country Report is insufficient to compel the conclusion that *Petitioner* would be tortured if returned. *See Almaghzar v. Gonzales*, 457 F.3d 915, 922–23 (9th Cir. 2006) (rejecting a petitioner's CAT claim that was supported solely by discredited testimony and the relevant country report). Therefore, because Petitioner's CAT claim is based on the same testimony found to be not credible, and she points to no other evidence that the IJ should have considered, substantial evidence supports the denial of CAT relief. *See Farah*, 348 F.3d at 1157.

## IV. DUE PROCESS

"[A]n alien who faces deportation is entitled to a full and fair hearing of [her] claims and a reasonable opportunity to present evidence on [her] behalf." *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000). We will reverse the BIA's decision on due process grounds "if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Id.* at 971 (internal quotation marks omitted). "To warrant a new hearing, the alien must also show prejudice, which means that 'the outcome of the proceeding may have been affected by the alleged violation.'"

*Cinapian v. Holder*, 567 F.3d 1067, 1074 (9th Cir. 2009) (quoting *Colmenar*, 210 F.3d at 971).

Here, Petitioner asserts that the IJ deprived her of her due process right to a full and fair hearing. Specifically, Petitioner argues that the IJ abandoned her role as a neutral fact-finder and imposed "moral judgment" as exhibited by the IJ's questions and comments about Petitioner's relationship with her roommate, Mr. Im. Because Petitioner has failed to show that the IJ prevented her from presenting evidence and because Petitioner has failed to articulate how this alleged deprivation prejudiced her, her due process challenge must fail.

True enough, this Court has previously held that an alien's due process rights may be deprived when the IJ's on-the-record view of the petitioner's personal relationships prevented the IJ from acting as a neutral fact-finder. *See Reyes-Melendez v. INS*, 342 F.3d 1001, 1007 (9th Cir. 2003) (holding that a petitioner was denied a full and fair hearing when the IJ repeatedly "inquired into the sexual nature of [the petitioner's] relationships with his wife and former paramour"; "asked how many women with whom he had engaged in sexual intercourse"; and "mentioned the fact that his children had two different mothers on at least six occasions"). However, in this case, the IJ's questioning does not reflect such a lack of impartiality. On the contrary, the IJ was attempting to understand the relationship, whether familial or otherwise, between Petitioner and Mr. Im. *See, e.g.*, *United States v. Dring*, 930 F.2d 687, 691 (9th Cir. 1991) ("[I]t would be permissible to imply that, because of *bias* due to *family relationship*, a father is lying to protect his son."). Thus, the IJ did not violate Petitioner's right to due process.

Even if Petitioner had shown that the IJ's questioning prevented Petitioner from reasonably presenting her case, Petitioner failed to articulate how this alleged violation of due process affected the outcome of the proceedings. *See Cinapian*, 567 F.3d at 1075.

## V. CONCLUSION

The petition for review is **DENIED**.

---

BEA, Circuit Judge, dissenting in part and concurring in part:[1]

I respectfully dissent. The BIA accepted the IJ's adverse credibility finding ("ACF"), which rested upon five purported inconsistencies and omissions in petitioner's testimony. Because the majority affirms as to only one of those purported inconsistencies, I will not address the rest. I conclude, however, that the IJ did not base her ACF upon "substantial evidence," but rather upon her own misunderstanding of petitioner's attorney's non-chronological questions and of the plain words of petitioner's answers. That is, the IJ offered no "legitimate articulable" basis or "specific cogent reason" for her decisions, *Gui v. I.N.S.*, 280 F.3d 1217, 1225 (9th Cir. 2002), and I would therefore reverse and remand with instructions to find petitioner credible.

---

[1] I concur in that part of the majority's decision that finds that the IJ showed no prejudice that made the proceeding fundamentally unfair.

*"Jail" cell versus "interrogation" room.*

The IJ cited a supposed inconsistency between petitioner's asylum application declaration and her live testimony. In her asylum application declaration, petitioner said she had been kicked and slapped by Chinese police in an interrogation room. The BIA accepted the IJ's finding that petitioner mentioned in live testimony only being forced to read government newspapers until she was "reminded" about the physical abuse—even after being asked twice "did anything else happen?"

But the record shows that the BIA and IJ's conclusions were not products of "specific cogent" or "legitimate" reasoning based on what was actually asked and answered at the hearing. *Gui*, 280 F.3d at 1225; *Zi Lin Chen v. Ashcroft*, 362 F.3d 611, 617 (9th Cir. 2004). Bear with me while the scene is reconstructed from the record, then judge for yourself.

For eight pages of the record petitioner gave detailed testimony about her conversion to Christianity and her religious activities in China. At length, her attorney turned to January 16, 2005, when petitioner's underground house church in Jilin Province was raided by about fifty police officers. Petitioner's attorney began the following line of questioning:

Q. How many of you were arrested?

A. About 20 people.

Q. Okay, where did, did they take you?

A. To police station.

Q. Okay, and how long were you detained at the police station?

A. For about 17 days.

Q. Okay.  During these 17 days, did police ever interrogate you?

A. Yes.

Q: How many times?

A: Once.

Q: Okay.  *Besides interrogating you*, did police do, did anything to you during these 17 days?

A: Yes.

Q.  What did they do?

A.  They forced me to read [a] government newspaper.

(Emphasis added).  Then petitioner's attorney asked her "Okay, what else?" and she responded that she was forced to write reports about the newspapers under threat that her parents would be arrested if she did not.  Her attorney then asked "Okay.  Anything else happen?" and she responded "no."

At that point her attorney said "But on your statement you say that they kicked you."**2**   The court asked petitioner to explain: "Ma'am, your testimony is inconsistent with your declaration.  Why is that?"  Petitioner answered: "I believe that it is consistent.  In what way?"  The IJ responded:

> You just told me that they forced you to read a paper, they threatened to arrest your parents and they forced you to write a report and that nothing else happened.  The inconsistenc[y] is because your statement says that you were beaten.  Now why did you fail to mention that in your testimony?

Petitioner replied: "[b]ecause I, I understood that my attorney asked me before I went to jail why, why [while, while], I was interrogating, what kind of thing happened, I understood that way.  That's why I mentioned that."**3**

---

**2** This apparently was when petitioner was "confronted" with her declaration, as the IJ characterized the testimony in her oral opinion.

**3** The government calls this explanation "incomprehensibl[e] and confusing[]."  Any confusion is likely attributable to the translator, Ms. Lee, who clearly meant "while" where the transcriber heard "why"; Ms. Lee's English was poor and her accent very thick.  *See*, *e.g.*, "If you believe in God, you're going to be more comfortable feeling in your mind."; "Because at that time, police officer told us that he writes this to illegally, he writes this gathering illegally, they said.";  "Q.  Are you employed, sir?  A. Yes.  I am running toying company.  JUDGE TO MS. LEE: A toy company?  MS. LEE TO JUDGE: Toying.  JUDGE TO MS. LEE: Coin?  MR. IM TO JUDGE: Toying.  MS. LEE TO JUDGE: Toying.  Toying company.  JUDGE TO MR. IM: Towing vehicles?  A. Yes."

The IJ's response to that is puzzling: "No, because you testified that you had been forced to read a paper, that you had to write reports, so your testimony indicates you understood the scope of the question." But, as petitioner explained,

> So why [while] I was in the jail and they forced me to read a paper, *but before I went to jail, while they were interrogating me, and they beat me*. Because as soon as I arrive in the police station they took me to the interrogating room and then they started interrogating me. At that time, the police officer beat me. *Because my attorney just asked me that, what kind of a thing happened in the jail that's why I just mentioned that part right now.* (Emphasis added).[4] No wonder petitioner "just mentioned that part right

---

This circuit has warned that "faulty or unreliable translations can undermine evidence on which an adverse credibility determination is based." *He v. Ashcroft*, 328 F.3d 593, 598 (9th Cir. 2003).

[4] The interrogation room, jail, police station, and cell all were part of the same building complex, but were separate areas. Petitioner's attorney asked her:

> Q. Okay. So where were you interrogated?

> A. In interrogating room. [sic]

> Q. And that interrogating room is not part of the jail?

> A. It's part of police station and jail, but I, I just understood that you just asked me why [while] I was in the jail, inside of the cell. [sic]

now"; remember, the "scope of the question"
had been:

Q. Okay. During these 17 days, did police
ever interrogate you?

A. Yes.

Q: How many times?

A: Once.

Q: Okay.  *Besides interrogating you*, did
police do, did anything to you during these 17
days?

The substance of the testimony was clear. Petitioner had
been beaten during her one interrogation, in the interrogation
or "interrogating" room. After that, she was jailed for
seventeen days and made to read government newspapers and
write reports—and nothing *else* happened during the
seventeen days.

What specific, cogent, articulable basis did the IJ have for
her conclusion in her oral opinion that petitioner, even when
asked "anything else," "omi[tted]" mention of beatings until
"reminded?"  It can only be that petitioner answered her
attorney's questions precisely as, and in the order that, they
were presented to her. I am quite sure it is not the law of this
circuit to fault asylum petitioners and label them not credible
for answering their attorneys' questions as asked. And the
attorney's meandering questions are not "substantial
evidence" of *petitioner's* credibility—if anything, petitioner's
precise and unenhanced answers to her attorney's precise

questions demonstrate her "candor" and "responsiveness," two of the factors an IJ should consider in an ACF determination under the REAL ID Act. 8 U.S.C. § 1158(b)(1)(B)(iii).

Indeed, once petitioner's attorney back-tracked his questions to the interrogation that he had leapt *entirely* over in his first line of questioning, and posed the non-leading question "Okay, why don't you tell us then what happened in the interrogation room," petitioner testified consistently with her declaration in describing her physical abuse. She stated that she was slapped, accused of anti-government illegal activities, and was threatened with "jail" if she did not confess. With no further prompting from her attorney, she then described in detail how she was "hit" with a leather boot in her lower back and legs until she fell to the ground and lost consciousness. She admitted that after she fell down, "nothing else happened." She said that when she woke up she was in a cell with five other people, and was so bruised that she asked for medical attention, but was refused.

Her live testimony was compelling and consistent with her declaration, in which she averred she was arrested, then first taken to an "interrogation" room, where she was slapped, accused of anti-government illegal activity, and then kicked with shoes until she "passed out." When she woke up, she wrote, she was "in a cell" in great pain and "barely able to move." Only "[t]hereafter," she wrote in her declaration, was she forced to read newspapers and write reports. (Emphasis added). The IJ, however, took no note of *that* consistency between the declaration and the testimony, in disregard of "the totality of the circumstances approach" of the REAL ID Act that "imposes the requirement that an IJ not cherry pick solely facts favoring an adverse credibility determination

while ignoring facts that undermine that result." *Shrestha v. Holder*, 590 F.3d 1034, 1040 (2010).

The majority asserts that I merely credit Jiang's testimony more than the IJ did, as though on *de novo* review, that my interpretation is merely one "feasible" view of the testimony among many, and that nothing *compels* my contrary conclusion, as the REAL ID Act requires. Not so: the *words* compel my conclusion. Words matter.[5] Petitioner was asked a question composed of words: what did the authorities do "*besides interrogat*[*e*] *you*?" The later words "anything *else*?" had as their plain antecedent the initial words "*Besides* interrogating you, did police do, did *anything* to you during those 17 days?" After relating that she had to read government propaganda and write reports, the only truthful, accurate response petitioner could give to the *words* "besides," "anything," and "else," no matter how many times the words were repeated, was "no."

---

[5] I recall an exchange from *A Man for All Seasons*:

> MORE: (Very still) What is the oath?
>
> ROPER: (Puzzled) It's about the marriage, sir.
>
> MORE: But what is the wording?
>
> ROPER: We don't need to know the (Contemptuously) wording—we know what it will mean!
>
> MORE: It will mean what the words say! An oath is made of words!

Robert Bolt, *A Man for All Seasons*, Act II, 74–75 (Heinemann, 1960).

Indeed, the BIA's use of "detention"[6] and the IJ's use of "jail" showed that neither paid precise attention to the words that described events that took place in (1) the interrogation room—interrogation and beating when petitioner would not sign a "confession," and (2) the jail cell—where the petitioner was made to read government propaganda and write reports. Similarly, the BIA noted that the IJ "thought it significant that [petitioner] finished testifying about these events and was asked if anything else happened to her, to which she responded [n]o." The record shows otherwise. Petitioner was not "*finished*" testifying about what happened to her: she *had not yet been asked* about the "interrogation." Petitioner's attorney simply skipped from the questioning in the interrogation room to the forced reading and writing in the jail cell, without asking about the beating that took place in the interrogation room. I do not consider reasoning based on the erroneous interpretation of plain words, particularly words with meanings consistent with petitioner's declaration, to be "substantial evidence," based on "specific, cogent," or "legitimate" reasons, that can support an ACF. *Gui*, 280 F.3d at 1225.[7] And without that reasoning, petitioner's testimony

---

[6] A word not used during the IJ hearing testimony.

[7] *See also Chengjun Wu v. Holder*, 434 F. App'x 592 (9th Cir. 2011). In that case, the IJ found petitioner not credible because of an "inconsistency" between petitioner's written declaration and her testimony. In her written application, petitioner wrote she had a forced abortion and an IUD implanted in 1985. *Id.* at 593. The IUD caused complications, was removed, petitioner became pregnant again in 1994, and was forced to have a second abortion. At the IJ hearing, petitioner was asked if she had the abortion and IUD put in on the same day. Petitioner, through a translator, testified that she was forced to have the first abortion and then "immediately" had the IUD implanted. *Id.* Petitioner later "clarified" the IUD was put in "the 'second time'" "after she 'went back to the hospital'" because she was in pain from the

was nothing but consistent and compelling.**8**  *Kin v. Holder*,

---

abortion.  *Id.*  The IJ, however, interpreted the word "immediately" to mean that the IUD was put in the "same day" as the abortion.  The IJ interpreted the clarifying words "second time" to mean the "second abortion," and found the petitioner not credible because the words were inconsistent with the declaration and because "immediate[]" implantation of an IUD after an abortion is medically out of the question.  *Id*. at 594.  The panel, however, granted the petition for review and remanded with instructions to find petitioner credible, and concluded that the IJ's interpretations of the words of petitioner's testimony did not constitute substantial evidence: "[t]he IJ's strained interpretation of Wu's testimony is based entirely on ambiguity in the word 'immediately,' but Wu's meaning was made clear by her subsequent testimony . . . Basing an adverse credibility determination on an applicant's fine-grained word usage is particularly inappropriate in cases, such as this, where there is an obvious language barrier."  *Id.*

**8** Petitioner's testimony was also consistent with the State Department's 2005 report on the persecution of house churches in China, including in petitioner's native Jilin Province:

> Protestant house churches and their leaders were subject to a selective crackdown in many areas.  Authorities frequently disrupted house church meetings and retreats and detained leaders and church members.  In May authorities reportedly detained hundreds of house church members from different groups in Jilin Province . . . . On August 2, authorities reportedly abused some of 40 worshipers detained in Hubei Province's Zaoyang City.  On August 7, a house church in Hejing County, Xinjiang Province, was reportedly raided and several worshipers were detained.

Evidence from the State Department is one of the enumerated factors under the REAL ID Act that can show the credibility of a petitioner's testimony.  8 U.S.C. § 1158(b)(1)(B)(iii).  *See also Ren v. Holder*, 648 F.3d 1079, 1089 (9th Cir. 2011) (State Department evidence supported petitioner's claims that he was persecuted as part of a Chinese Christian house church).

595 F.3d 1050, 1054 (9th Cir. 2010).  I would therefore reverse and remand with instructions to find the petitioner credible, and I respectfully dissent.